**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO**

Civil Action No. 1:24-cv-3433

DEFENDERS OF WILDLIFE,

     Plaintiff,

v.

DEBRA HAALAND, in her official capacity as Secretary of the U.S. Department of the Interior,

     and

U.S. FISH AND WILDLIFE SERVICE,

     Defendants.

_____

**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**
_____

**<u>INTRODUCTION</u>**

1.     Plaintiff Defenders of Wildlife ("Defenders") challenges the failure of the Secretary of the U.S. Department of the Interior (the "Secretary") and the U.S. Fish and Wildlife Service (collectively, "FWS" or the "Service") to make the "12-month finding" required by the Endangered Species Act ("ESA"), 16 U.S.C. § 1531 *et seq.*, in response to Defenders' petition seeking ESA protection for the Pinyon Jay, an iconic keystone species that plays a vital sustaining role in many western landscapes. The global population of these charismatic, dusky blue birds has drastically declined over at least the past fifty years.

2.      Alarmed by this persistent and precipitous decline, Defenders submitted a Petition to List the Pinyon Jay (*Gymnorhinus cyanocephalus*) as Endangered or Threatened Under the Endangered Species Act (the "Petition") to FWS on April 25, 2022.[1] The "listing" process under ESA Section 4 is a threshold step that determines whether or not a species receives the benefits and protections of this bedrock conservation law.

3.      There is an inherent urgency to a situation like the Pinyon Jay's and a petition like Defenders'. And, here, FWS already has found that Defenders supported its Petition with "substantial scientific or commercial information."[2] Accordingly, Section 4 requires FWS to determine, within 12 months of receiving the Petition, whether the petitioned-for action is warranted. *See* 16 U.S.C. § 1533(b)(3)(B). Congress made the deadline for this determination, colloquially known as a "12-month finding," mandatory. As described below, it admits of no excuses and no exceptions.

4.      The ESA deadline passed in April 2023. FWS still has not made a 12-month finding. The failure to do so violates both the ESA and the Administrative Procedure Act ("APA"), 5 U.S.C. § 551 *et seq.*, which supplies the standard of review in this ESA action.

5.      Meanwhile, much hangs in the balance. Not only is the Pinyon Jay's place on this planet at stake, so too is the integrity, and perhaps even the persistence, of an entire ecosystem. Pinyon Jays have a mutualistic, symbiotic relationship with the piñon pine. Loss of the Pinyon Jay therefore may well mean loss of the piñon-juniper woodlands

---

[1] *Petition to List the Pinyon Jay (*Gymnorhinus cyanocephalus*) as Endangered or Threatened Under the Endangered Species Act*, Defenders of Wildlife (Apr. 25, 2022), 2022.4.25_FWS_Listing petition_Pinyon Jay.pdf.

[2] Endangered and Threatened Wildlife and Plants; 90-Day Findings for Five Species, 88 Fed. Reg. 55991, 55995 (Aug. 17, 2023).

that dominate large swaths of the Southwest and interior West, along with other species those lands long have supported. Such ecological destruction would entail cultural losses as well.

6.      Defenders brings this action to compel compliance with Section 4's mandate. FWS must make this determination as soon as possible.

**JURISDICTION, VENUE, & PRE-SUIT NOTICE**

7.      The Court has jurisdiction over this action pursuant to ESA Section 11, 16 U.S.C. § 1540(c) and (g)(1)(C) (ESA citizen suits), 28 U.S.C. § 1331 (federal question jurisdiction) (claims under ESA and APA), and 28 U.S.C. § 1346(a)(2) (agency defendant). The Court may grant the relief requested under the ESA, *see* 16 U.S.C. § 1540(g), under the APA, 5 U.S.C. §§ 701–706, and under 28 U.S.C. §§ 2201 and 2202 (declaratory and injunctive relief).

8.      Defenders provided notice to FWS of the ESA violations identified herein more than 60 days before filing this lawsuit, as required by ESA Section 11(g), 16 U.S.C. § 1540(g). FWS received Defenders' notice letter, dated October 7, 2024, by email that same day and via U.S.P.S. certified mail, return receipt requested, on October 11, 2024. FWS has not remedied the ongoing violations of law.

9.      Venue is proper in the United States District Court for the District of Colorado pursuant to 16 U.S.C. § 1540(g)(3)(a) because this is a district in which the ESA violation has occurred and is occurring. Venue is also proper under 28 U.S.C. § 1391(e) because a defendant resides in this district and a substantial part of the events or omissions giving rise to the claim occurred here. FWS has an office in Lakewood,

Colorado, at which the agency's "Landbird Coordinator," who is integral to FWS' Pinyon Jay work, and the head of FWS "Region 6" are both based. Additionally, Colorado is among the places in which Pinyon Jays and their habitat are in need of the ESA protection sought in Defenders' Petition.

## PARTIES

10.     Plaintiff DEFENDERS OF WILDLIFE is a non-profit, membership organization headquartered in Washington, D.C. with members and staff across the country, including at a field office in Denver and two staff members based in New Mexico. Founded in 1947, Defenders is a science-based conservation organization with more than 286,000 members nationwide, including over 7,000 members in Colorado and many more across the interior West. Defenders is dedicated to the protection of all native wild animals and plants in their natural communities and the preservation of the habitats on which they depend. Known for our effective leadership on endangered species issues, Defenders has been involved in issues of ESA implementation since the statute was passed in 1973. Defenders' 2019-2028 Strategic Plan identifies keystone species like the Pinyon Jay as one of several key groups of species whose conservation is a priority for the organization's work. It has been prioritizing working to protect the Pinyon Jay, specifically, since 2020. Defenders brings this action on its own behalf and on behalf of its members.

11.     The legal violations alleged in this Complaint cause direct injury to the scientific, aesthetic, recreational, conservation, educational, and other interests of Defenders and its members and staff—including the injuries described below. These are actual, concrete injuries to Defenders, caused by FWS' failure to comply with the ESA

and the APA. Unless the requested relief is granted, Defenders' interests will continue to be injured by FWS's violations of law. The relief sought herein would redress Defenders' injuries. Defenders has no other adequate remedy at law.

12.     For example, one member and staffer of Defenders considers the Pinyon Jay a huge part of her life since moving to Santa Fe, New Mexico more than ten years ago. Birding is one of her favorite pastimes and Pinyon Jays are one of her favorite birds to see and hear, in part due to their unique call. She makes a point to look and listen for Pinyon Jays near her home. During nesting season, she has the opportunity to see individual birds, and she also has seen flocks of Pinyon Jays flying over her neighborhood. She enjoys hiking in a wide range of areas, including the Dale Ball trail system and in the Ortiz mountains, where she has the opportunity to encounter Pinyon Jays. During these visits, this member regularly looks for Pinyon Jay flocks, especially during the spring nesting season. She will stop along the way to listen for and watch them. These activities are an integral part of her life that she plans to continue.

13.     Her enjoyment is diminished, however, by concern over the Pinyon's Jay's ongoing decline and the lack of ESA protection. Already, she sees fewer Pinyon Jays in flocks in certain areas than once were present. This member is acutely aware of the Pinyon Jay's plight and its mutualistic relationship with the piñon pine. She recognizes that loss of the Pinyon Jay threatens the persistence of the piñon-juniper woodlands she loves. This would fundamentally alter her home area. Over the past decade, she has devoted much of her career to Pinyon Jay conservation. The prospect of that work coming to naught is troubling.  She cannot imagine a New Mexico without Pinyon Jays and, if

they disappear, she fears she will have to leave the state to alleviate the pain this would cause.

14.    Defenders submitted its listing Petition before this member joined the organization. At the time, she experienced a flood of relief upon learning of Petition. As time passed, seeing Defenders do all it can to conserve the Pinyon Jay, while FWS fails to carry out its statutory obligation, has proven challenging. FWS issuing the delayed 12-month determination would resolve uncertainty. And, a positive finding would provide Pinyon Jays needed protection.

15.    As another example, a different Defenders member in Eldorado, New Mexico, was drawn to the community in which she now lives in large part because it provided the opportunity to encounter wildlife. She has long enjoyed learning about and identifying birds, their songs, and their migratory patterns. When she moved to New Mexico, she continued that pastime. Now, she sees the Pinyon Jay as both an important part of her community and a big part of her own life. When she is out walking, she hopes she will see a flock fly overhead. That does not always happen, but when it does, it is always exciting. A lover of the outdoors, she spends time hiking as much as she can. Currently, that is a few times per week. Most often, she visits the Santa Fe Rail Trail and the nature preserve near her home. During those times, she listens and looks for Pinyon Jays. She plans to continue this activity in these same places. As much as she enjoys it, seeing Pinyon Jays also feels bittersweet. She is concerned about the species' survival and also worries what the Pinyon Jay's loss would mean for piñon pines.

16.    Defendant DEBRA HAALAND is the Secretary of the Department of the Interior and is sued in her official capacity. The ESA vests the Secretary of the Interior with responsibility for implementing the ESA with respect to terrestrial and freshwater species. This includes responsibility for making listing decisions.

17.    Defendant U.S. FISH AND WILDLIFE SERVICE is an agency within the Department of Interior. The Secretary has delegated the authority and responsibility to administer and implement the ESA to FWS. FWS is thus responsible for listing determinations pertaining to species such as the Pinyon Jay, including timely compliance with ESA deadlines.

## **BACKGROUND**

### I.    **Legal Framework**

#### The Endangered Species Act

18.    Congress enacted the ESA to establish a "program" and a "means" of conserving endangered and threatened species and the ecosystems on which they depend. 16 U.S.C. § 1531(b). The statute, which recognizes the "incalculable" value of these species, "represent[s] the most comprehensive legislation for the preservation of endangered species ever enacted by any nation." *Tenn. Valley Auth. v. Hill*, 437 U.S. 153, 180, 187-88 (1978). The ESA has a proven track record of bringing imperiled species back from the brink. Some 95-99% of the species ever protected under the Act still exist today. This includes successfully recovered species, like our national symbol, the bald eagle.

19.    The ESA's benefits and protections hinge on whether the wildlife agency, in this case, FWS, has listed the species at issue as having "endangered" or "threatened" status under the statute. *See generally* 16 U.S.C. § 1533 (Section 4). These include, but are not limited to, provisions for designation of critical habitat under ESA Section 4; ESA Section 7's obligation for federal agencies to engage in consultation with the relevant wildlife agency (here FWS) to ensure their actions are not likely to jeopardize the species or adversely modify its critical habitat, and ESA Section 9's prohibition on actions that kill or harm the species. *See* 16 U.S.C. §§ 1533, 1536, 1538.

20.    ESA Section 4 mandates that FWS make listing determinations according to five enumerated factors. *See* 16 U.S.C. § 1533(a)(1). These factors concern threats to the species from: (A) the present or threatened destruction, modification, or curtailment of its habitat or range; (B) overutilization for commercial, recreational, scientific, or educational purposes; (C) disease or predation; (D) the inadequacy of existing regulatory mechanisms; or (E) other natural or manmade factors affecting its continued existence. *See id.* It also sets forth the procedures for making such determinations. *See generally* 16 U.S.C. § 1533.

21.    Given listing's importance, "Congress from the outset recognized" timeliness in the process as "essential." *Biodiversity Legal Found. v. Badgley*, 309 F.3d 1166, 1175 (9th Cir. 2002) (internal quotation marks omitted). In 1982, it passed amendments to the statute specifically to speed the listing process and prevent species from "languishing" in reviews. *See id.* Thus, for decades, Section 4 has set forth mandatory deadlines.

22.     The listing process may be triggered in one of two ways. FWS may initiate a listing determination pursuant to its Section 4 authority. *See* 16 U.S.C. § 1533(a). Or, as relevant here, "[a]ny 'interested person' may petition the FWS to list a species." *Ctr. for Biological Diversity v. Haaland*, No. 20-573 (EGS), 2023 WL 2401662, at *2 (D.D.C. Mar. 8, 2023) (quoting 16 U.S.C. § 1533(b)(3)(A)).

23.     Upon receipt of a citizen petition, FWS must, to the maximum extent practicable, "make a finding as to whether" the petition "presents substantial scientific or commercial information indicating that the petitioned action may be warranted" within 90 days. 16 U.S.C. § 1533(b)(3)(A). This is known as a "90-day" finding. The finding may be "positive" or "negative" depending on FWS's assessment of the petition. If FWS finds that the petition does "present such information," it must promptly publish a positive finding in the Federal Register and commence a review of the species' status for purposes of the next part of the process. *See id.* By contrast, if FWS finds the petition lacks the requisite support, it must publish a negative finding, concluding the process. *See id.*

24.     If FWS makes a positive "90-day finding" (regardless of whether it does so within or outside the 90-day window for which it is to aim), it must timely complete the status review and publish a 12-month finding. Specifically, Section 4(b)(3)(b) provides that within 12 months of receiving the petition, FWS "shall make one of the following findings:" (1) that the petitioned action is warranted; (2) that the petitioned action is not warranted; or (3) the petitioned action is warranted but precluded due to circumstances specified in the statute. *See* 16 U.S.C. § 1533(b)(3)(B).

25.    Regardless of which determination FWS makes, it must promptly publish the 12-month finding in the Federal Register. *See id.* If FWS makes a "positive" 12-month finding, determining that the petitioned action is warranted, that publication must include both "a general notice and the complete text of a proposed regulation to implement" the "action in accordance with" notice requirements set forth in subsection 4(b)(5). *See* 16 U.S.C. § 1533(b)(3)(B)(ii). FWS then is to publish a final rule within one year of issuing the proposed rule. *See* 16 U.S.C. § 1533(b)(6).

26.    The deadlines by which FWS "shall" make listing determinations, including 12-month findings, are mandatory. *See, e.g.*, *Friends of Animals v. Ashe*, 808 F.3d 900, 903, 905 (D.C. Cir. 2015); *Ctr. for Biological Diversity*, 2023 WL 2401662, at *2 ("The ESA permits no exceptions to this 12–month mandatory deadline.") (quoting *In re Endangered Species Act Section 4 Deadline Litig.*, 277 F.R.D. 1, 4 (D.D.C. 2011)). They admit of no exceptions and no excuses. *See, e.g., Sw. Ctr. for Biological Diversity v. Dep't of Interior*, No. CIV99519LFGLCSACE, 2000 WL 36739927, at *3 (D.N.M. Mar. 13, 2000). And, FWS has no discretion to disregard a mandatory Section 4 deadline or set a different timetable. *Forest Guardians v. Babbitt*, 174 F.3d 1178, 1190-92 (10th Cir. 1999).

27.    If FWS determines that listing a species as endangered or threatened is warranted, it "shall" also promulgate a regulation concurrently with the listing decision that designates, to the maximum extent prudent and determinable, critical habitat for the species. 16 U.S.C. § 1533(a)(3)(A).

28.    There are two exceptions to this requirement of concurrent action: (1) if conservation of the species requires prompt publication of the final regulation

implementing a listing decision; or (2) if critical habitat for the species is not determinable at the time, in which case a one-year extension of the deadline for the critical habitat determination applies. *See id.* § 1533(b)(6)(C).

29.    Section 4 requires FWS to make listing and critical habitat determinations, including 12-month findings, based on "the best scientific and commercial data available." *See id.* § 1533(b)(1)-(2). This "best available science" standard refers to science that is "available"—i.e. that presently exists. It does not require FWS to conduct, much less wait for, other studies. *See, e.g.*, *Sw. Ctr. for Biological Diversity v. Babbitt*, 215 F.3d 58, 60 (D.C. Cir. 2000) (no obligation to conduct independent studies); *San Luis & Delta-Mendota Water Auth. v. Locke*, 776 F.3d 971, 995 (9th Cir. 2014) (stating in the Section 7 context that the best available science standard does not "require an agency to . . . make decisions on data that does not yet exist"). Nor does it permit FWS to delay based on analysis that the agency might want, but does not need, to perform. *See Ctr. for Biological Diversity v. U.S. Fish & Wildlife Serv.*, No. C 16-06040 WHA, 2018 WL 6067546, at *4 (N.D. Cal. Nov. 20, 2018).

<u>The Administrative Procedure Act</u>

30.    "In determining the proper remedy for" FWS's violation of a Section 4 deadline, the Tenth Circuit "rel[ies] on the standards of review provided in the [APA]." *Forest Guardians*, 174 F.3d at 1186. "When an agency fails to meet a concrete statutory deadline, it has unlawfully withheld agency action" in violation of the APA, and a reviewing court must "compel the action unlawfully withheld"; it has no discretion to do otherwise. *See id.* at 1190-92.

31.     In imposing a deadline by which the agency must remedy the violation, a court "must consider what work" remains to be done "and how quickly that can be accomplished," requiring action "as soon as possible, without regard" to other ESA priorities. *Id.* at 1193.

## II.    Factual Background

<u>The Pinyon Jay</u>

32.     As described above and further below, the Pinyon Jay plays an important role in the biodiversity of the interior West. It is, as Defenders' Petition explained, one of the most genetically distinct and ecologically important species in North America.



**Figure A.** Tom Benson, *Pinyon Jay perching in a tree* (photograph), *in* Flickr (May 22, 2016).

33.     The Pinyon Jay's range spans suitable habitats across Oregon, California, Nevada, Idaho, Utah, Arizona, Montana, Wyoming, South Dakota, Nebraska, Oklahoma, New Mexico, and Colorado. The map below is excerpted from FWS email

correspondence, obtained through FOIA and attached to Defenders' Notice of Intent to Sue:



Figure 1. Pinyon Jay Range, showing Bird Conservation Regions. Data from BBS. Irruptions and vagrants not included. CC BY Defenders of Wildlife 2021. See Appendix 1 for metadata.

34.    As a piñon-juniper obligate species, the Pinyon Jay cannot survive without piñon-juniper woodlands. Its range largely overlaps with that of piñon pines, specifically. Although Pinyon Jays eat many things, their primary food is piñon pine seeds, often referred to as pine nuts.

35.    Pinyon Jays cache the seeds for the winter, especially during years in which piñon pines produce a mast crop of cones containing pine nuts. Pinyon Jays can carry dozens of seeds at one time and can collect and cache as many as 2,600 in a good seed year. Known for their intelligence, these birds for the most part remember where they hid

the seeds. Still, they inevitably forget some, effectively planting new trees. Those seeds grow into the next generation of piñon pines, replenishing the woodlands.

36.     Because of the role the Pinyon Jay plays as a long-distance seed disperser for piñon pines, the species is crucial for the establishment and maintenance of piñon-juniper woodlands.

37.     No other animal caches as many seeds and plants as many piñon pines as the Pinyon Jay. Pinyon Jays are the only dispersers capable of re-establishing piñon pines after disturbances like fire and insect infestation.

38.     The Pinyon Jay is therefore key to the conservation of other birds and wildlife that depend on piñon-juniper habitats.

39.     Piñon-juniper woodlands are rich in biodiversity. They sustain a range of other wildlife, including species of conservation concern. Overall, at least seventy-three different bird species breed in piñon-juniper habitats. These include, for example, the Juniper Titmouse (*Baeolophus ridgwayi*) and Gray Vireo (*Vireo vicinior*). Closer to the ground, other species, like the Oscura Mountains Colorado chipmunk, also depend on these ecosystems. The interdependence of the Pinyon Jay and piñon pine means that, in effect, the functioning of an entire ecosystem is at risk due to the Pinyon Jay's decline.

40.     In addition to the ecological damage, risks to the Pinyon Jay and piñon-juniper ecosystem threaten cultural losses as well. Pine nuts are a staple in Southwestern cuisine and collecting them is a time-honored tradition for many families in the West. Native Americans in the West have harvested and consumed pine nuts for generations,

and disappearance of these seeds would disproportionately impact Native American tribes and Hispanic communities.

41.     Piñon pine trees are slow growing. It can take decades for some types of piñon pine to produce cones and 100 years to produce good seed crops. Meanwhile, the Pinyon Jays that depend on the tree and its seeds are known to avoid breeding in the absence of seed crops.

Defenders' Petition and the Ongoing Threats to the Pinyon Jay's Existence

42.     Pinyon Jay populations have been declining rangewide for at least fifty years. As described above and in Defenders' Petition, the loss is dramatic.

43.     Indeed, a FWS staff member stated in an internal email that it "seems very possible" we could lose another 50% or more of the global population by the end of the century.

44.     Further, to the extent pertinent new studies have been completed since Defenders submitted its Petition, they underscore threats to the Pinyon Jay.

45.     In addition to detailing the science concerning the Pinyon's Jay's precipitous decline, Defenders' April 2022 Petition described threats to the species.

46.     As detailed therein, ongoing loss of its woodland habitat represents a very significant threat to the Pinyon Jay's survival.

47.     Since the 1800s, millions of acres of piñon-juniper woodlands have been removed.

48.     Land managers continue to remove extensive amounts of piñon-juniper in the name of wildfire risk reduction, range resilience, or sagebrush restoration.

49.    Notably in this regard, federal agencies have jurisdiction over the largest proportion of Pinyon Jay occupied habitat in the United States. Together, the Bureau of Land Management ("BLM") and the U.S. Forest Service ("Forest Service") manage almost half (48.9%) of the Pinyon Jay habitat within the bird's range.

50.    A 2021 study suggests that, under their watch, extensive loss of suitable Pinyon Jay habitat has occurred on federal lands.

51.    The International Union for Conservation of Nature ("IUCN") has specifically identified the Forest Service's piñon-juniper eradication efforts as significant contributors to the decline of pinyon-juniper habitat across the Pinyon Jay range. These woodlands, according to the IUCN, are often removed to create or promote sage grouse habitat and have also been converted into cattle range.

52.    It also is becoming increasingly common to manage piñon-juniper for the perceived benefit of big game species, especially mule deer, by thinning trees, as well as to conduct extreme thinning for perceived fire hazard reduction.

53.    Both the Pinyon Jay and its habitat lack needed protection.

54.    Existing regulatory mechanisms at both the state and federal level are inadequate to protect the Pinyon Jay. Only the Migratory Bird Treaty Act currently protects the Pinyon Jay at the federal level, and it does not protect the species' habitat.

55.    Climate change and drought pose a significant threat to the Pinyon Jay as well.

56.    The Pinyon Jay also faces cumulative and synergistic effects of these and other threats, including disease, predation, increased frequency and severity of wildfire

(related to drought and climate change), and invasion of its habitat by non-native cheatgrass.

57.    FWS issued a positive 90-day finding in response to Defenders' Petition on August 17, 2023, citing a number of these threats. Therein, FWS explained that:

> Based on our review of the petition and readily available information regarding adverse habitat treatments in piñon-juniper woodlands (Factor A), increased wildfire frequency (Factor A), invasive species (Factor A), inadequacy of existing regulatory mechanisms (Factor D), and climate change (Factor E), we find that the petition presents substantial scientific or commercial information indicating that the petitioned action to list the pinyon jay as an endangered or threatened species may be warranted.[3]

The "Factor[s]" referenced therein are the five listing factors set forth in Section 4(a)(1)(A)-(E), described above. *See* 16 U.S.C. § 1533(a)(1).

<u>FWS Evidences No Sense of Urgency and Instead<br>Looks for Reason to Delay the 12-Month Finding</u>

58.    Following the positive 90-day finding, Defenders sought information about when FWS would make its 12-month determination.

59.    Internal emails concerning the 12-month finding that Defenders obtained through FOIA evidenced no sense of urgency to complete the determination.

60.    Instead, FWS sought to determine the pendency of any new studies concerning the Pinyon Jay in what one staff member described as an effort to figure out "how far down the road we can kick" the determination.

---

[3] Endangered and Threatened Wildlife and Plants; 90-Day Findings for Five Species, 88 Fed. Reg. 55991, 55995 (Aug. 17, 2023).

61.     In the internal records that Defenders obtained through FOIA, there was no indication of any parallel effort to ascertain and take into account imminent harms that could further decimate this species while it waits in limbo.

62.     As of November 2023, FWS had assigned the 12-month finding for the Pinyon Jay a tentative due date of fiscal year ("FY") 2028. It planned to formalize that determination when it published an updated version of its National Listing Workplan ("Workplan"), which the agency uses to prioritize its backlog of overdue listing decisions.[4]

63.     FWS's website indicates that the agency seeks to update the Workplan at least annually. And, it had published the last version in April 2023, before making its 90-day finding for the Pinyon Jay. Defenders accordingly anticipated that FWS would likely place the Pinyon Jay determination on the next iteration of the Workplan.

64.     The Workplan already contains a significant backlog, such that this version included plans from the agency's fiscal year "("FY") 2023-2027. Troublingly, FWS's website suggested the agency might add new determinations based on its "bin" system or might simply add new listings "to the back end of the Workplan."[5]

65.     Defenders wrote to FWS on March 27, 2024, hoping to persuade it to grant the Pinyon Jay a high priority placement before it committed to any course of delay in the

---

[4] In 2016, FWS published a non-binding methodology that it uses as a "tool" to place outstanding determinations on the Workplan. *See* 81 Fed. Reg. 49248, 49248 (July 27, 2016). In general, that methodology calls for FWS to place determinations in one of five priority "bins" and to further consider certain issues apart from "bin" order.

[5] *National Listing Workplan*, U.S. Fish & Wildlife Serv. (May 23, 2024), https://www.fws.gov/sites/default/files/documents/2024-05/national-domestic-listing-workplan-2024.pdf.

Workplan. Defenders' March 27, 2024 letter explained, among other things, that FWS's 2016 methodology supported a high priority placement for the Pinyon Jay. It also advocated that FWS should not simply tack this new listing onto the end of the existing Workplan.

66.    As it continued to receive interim productions of records through FOIA, Defenders also sent FWS follow-up correspondence on May 8, 2024 to raise concerns about more specific information disclosed in those materials.

67.    FWS published the updated Workplan on May 23 or 24, 2024.[6]

68.    The updated Workplan assigned the 12-month determination for the Pinyon Jay an estimated due date of FY2028.

69.    Internal emails obtained through FOIA indicate that this was as "far out as scheduling" went at the time FWS initially aimed for this timeframe.

70.    FWS admits that its estimated timeframe of FY2028 is no guarantee. It could slip into still further delay.

<u>FWS Offered Reasons for the Delay that Contradict<br>Settled Law and FWS's Internal Correspondence.</u>

71.    FWS did not provide a substantive response to Defenders' concerns until after it had published the updated Workplan. In a May 24, 2024 letter, it offered three reasons for delaying its decision.

72.    *First*, FWS asserted that it "should" wait for certain studies in order to adhere to the ESA's "best available science" standard.

---

[6] FWS's website lists May 23, 2024 as the publication date, but a letter from FWS states that the agency published the update on May 24, 2024.

73.     As a legal matter, as described above, the "best available science" refers to science that is available. It does not require or permit waiting for more study.

74.     As a practical matter, Defenders' earlier correspondence had explained, for example, that a number of the studies for which FWS wants to wait were occupancy or presence/absence surveys, which provide no information regarding population size or population trend, and most of which are limited to small portions of the Pinyon Jay range. Meanwhile, other existing sources already provide information about both population trends and population size.

75.     FWS offered no specific response to points Defenders raised regarding ongoing studies in its March 27 and May 8 correspondence.

76.     *Second*, FWS's May 24, 2024 letter asserted that it was "actively working" to develop a conservation agreement with the State of Utah and "encouraging other states" to do the same.

77.     If FWS has additional resources to devote to such efforts while still fulfilling its mandatory obligations under the ESA, it may direct them to such efforts. It may not, however, lawfully substitute its preferred priorities for Congress' mandate.

78.     Moreover, FWS's letter made no attempt to explain why the same outstanding studies it cited as reason to delay a 12-month finding would not also frustrate a conservation agreement.

79.     *Third*, FWS cited reduced staffing in its Utah Field Office.

80.    The records Defenders obtained through FOIA, however, do not show any staffing decline in that office over the past two years. Nor do they cite current or anticipated workload of any individual as a reason for delay.

81.    By contrast, staffing discussions did occur years ago, around the time Defenders submitted its Petition.

82.    In April 2022, the Utah Field Office sought a lead role in responding to Defenders Petition out of "an interest [in] being able to control the process."

83.    In doing so, its leadership recognized that the office lacked "the staff and capacity to do this alone" and would "need support and buy-in from other field offices, both from R6 FOs within the range of the species and also from Regions 1, 2, and 8."

84.    To take a lead role, the Utah Field Office also anticipated needing "SIGNIFICANT assistance from Migratory Birds/Sci Apps," including "substantial help" from the Colorado-based staff member who leads the "PIJA working group."

85.    FWS had no obligation to allow a particular office to "control the process." It could, and if staffing is responsible for the delay, should, have considered whether one of the multiple other offices in the heart of the Pinyon Jay's range could complete a more timely 12-month determination.

86.    There is no indication in the FOIA records Defenders received that in doing so, the agency considered whether a different office could complete the work more quickly or had greater resources and expertise to devote.

87.    The records that FWS produced through FOIA also evidenced no indication that other offices and/or departments on which the Utah Field Office sought to rely

declined to provide that help. Quite the opposite, the Colorado-based employee referenced appears to be taking a lead role in the response to Defenders' Petition.

88.    Even though the finding is long overdue, FWS's internal emails did not reflect a forward-looking calculation of the earliest time the determination could be completed. Instead, internal emails show that after ascertaining that FWS would place this determination on the Workplan for FY2028, staff worked backward from that Workplan "deadline" to decide when to start the Species Status Assessment ("SSA") for the Pinyon Jay.

89.    Reasoning that the finding would be "due" in FY2028, FWS emails show that staff decided to start the SSA in FY2025 or FY2026.

90.    FWS's May 24, 2024 letter later confirmed that FWS would not begin "formally developing" the SSA on which the finding is based until FY2025.

91.    There was no indication in the records disclosed that FWS, or individual staff, determined FWS staff lacked the resources to work on this determination before FY2025. Nor was there any suggestion that it would be impossible to start work on the SSA now (or even back in 2023), to continue the work completed for the 90-day finding.

92.    The Workplan was intended to aid the agency in distributing resources while doing all it can to cure its unlawful backlog. It was not meant to serve as an excuse to delay work the agency does have the capacity to do.

93.    Meanwhile, the Workplan shows that FWS Region 6, of which the Utah office forms a part, has the second-lowest listing load of any Region.

94.     Out of the more than two hundred actions on the Workplan (not all of which are listing determinations), FWS Region 6 is responsible for eight (including the Pinyon Jay). Some of those were slated for FY2024 and already done. FWS Region 6 has responsibility for *zero* determinations on the Workplan in FY2027.

<u>FWS Has Not Made the Required Finding</u>

95.     As described above, Defenders submitted its Petition on April 25, 2022.

96.     FWS's deadline to make a 12-month finding in response to the Petition passed in April 2023.

97.     FWS still has not made the 12-month finding.

**<u>CAUSE OF ACTION</u>**

<u>Violation of ESA and APA</u>

98.     Defenders hereby realleges and incorporates by reference each and every allegation set forth in the preceding paragraphs of this Complaint as if set out in full below.

99.     Under ESA Section 11, "any person may commence a civil suit" against the Secretary of the Interior for failure "to perform any act or duty under [ESA Section 4] which is not discretionary with the Secretary." 16 U.S.C. § 1540(g)(1)(C). In such suits, "[t]he district courts shall have jurisdiction . . . to order the Secretary to perform such act or duty." *Id.* § 1540(g)(1).

100.     Defenders is a person within the meaning of ESA Section 11.

101.     FWS has failed to perform a non-discretionary act or duty under Section 4.

102.     ESA Section 4(b)(3)(B), 16 U.S.C. § 1533(b)(3)(B), requires FWS to make a finding as to whether or not a petitioned action is warranted within 12 months after

receiving a petition that it has determined contains substantial scientific or commercial information indicating that the petitioned action may be warranted.

103.    FWS has violated, and continues to violate, ESA Section 4 by failing to perform the mandatory, non-discretionary duty to timely make a "12-month" finding on Defenders' Petition. FWS has not made the required 12-month finding.

104.    FWS's failure to make a timely 12-month finding constitutes agency action "unlawfully withheld or unreasonably delayed" within the meaning of the APA, 5 U.S.C. § 706(1).

105.    Under the APA, a "reviewing court shall . . . compel agency action unlawfully withheld or unreasonably delayed." 5 U.S.C. § 706(1).

## PRAYER FOR RELIEF

Defenders respectfully requests that this Court enter judgment providing the following relief:

A.  Declare that FWS has violated the ESA and the APA by failing to issue a timely 12-month finding in response to Defenders' Petition to list Pinyon Jay;

B.  Provide injunctive relief compelling FWS to publish in the Federal Register the overdue 12-month finding by a date certain;

C.  In ordering relief compelling publication of the finding on a date certain, the date ordered should be as soon as possible, meaning that the date is based on the time strictly necessary to complete needed work that remains undone on the determination, without regard for other priorities or preferences or diverting resources to other activities;

D.  Retain continuing jurisdiction to review FWS's compliance with all judgments and

orders herein;

E.  Grant Plaintiff its reasonable attorneys' fees and costs;

F.  Provide such other and further relief as the Court deems just and proper.


Dated this 11th day of December, 2024.


Respectfully submitted,
/s/ Lisa Saltzburg
**Lisa Saltzburg**
Defenders of Wildlife
600 17th Street, Suite 450N
Denver, CO 80202
Telephone: 720-943-0458
E-mail: lsaltzburg@defenders.org
Attorney for Plaintiff, Defenders of Wildlife

/s/ Charlotte Phillips
**Charlotte Phillips**
Defenders of Wildlife
600 17th Street, Suite 450N
Denver, CO 80202
Telephone: 202-772-0224
E-mail: cphillips@defenders.org
Attorney for Plaintiff, Defenders of Wildlife